# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

BILLY L. SEXSON,

       Plaintiff,

v.                                                    No. Civ. 98-154 MV/WWD

ALEX ROMERO & ROWLAND GARCIA,

       Defendants,

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

    1. THIS MATTER comes before the Court *sua sponte*, following the submission of a *Martinez* Report filed by Defendants on November 2, 1998 [**docket #42**] and a response by the Plaintiff. Plaintiff is an inmate at the Penitentiary of New Mexico and is proceeding *pro se* in this action based on a violation of the Cruel and Unusual Punishments Clause of the Eighth Amendment.

    2. Plaintiff contends that Defendants Romero and Garcia spread false information that tighter security measures were being enforced throughout the prison because of incidents involving Sexson and his wife in the visiting room. Sexson alleges that the spreading of this false information has placed him in danger of injury by other inmates, who apparently blame Sexson for the imposition of the new security measures. Defendants deny that either Romero or Garcia blamed the new security measures on Plaintiff. Defendant Garcia is employed at the North Facility with the Corrections Department in Santa Fe, where Plaintiff was housed at the time.

*Standard of Law*

3. Prison officials are responsible for taking reasonable measures to insure the safety of inmates. <u>Farmer v. Brennan</u>, 511 U.S. 825, 832-33 (1994); <u>cited in</u> <u>Lopez v. LeMaster</u>, 1999 WL 203054 (10th Cir. Okla.). In bringing this type of claim under the Eighth Amendment, an inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. In addition, a prison official must be shown to have a "sufficiently culpable state of mind," i.e., one of deliberate indifference to the inmate's health or safety. <u>Riddle et al v. Trevino et al</u>, 83 F.3d 1197, 1204 (10th Cir. 1996).

*Discussion*

4. Defendant Garcia is employed with the Corrections Department in Santa Fe as a Sergeant at the North Facility. Defendant Romero is a lieutenant assigned to the Emergency Response Team for the different units within the Penitentiary. Both Defendants deny making any false allegations concerning Plaintiff or his wife in connection with visiting room policy changes, and maintain that these changes were made on an ongoing basis without regard to either Plaintiff or his wife.

5. Following an inspection of the visiting rooms in the different units at the Penitentiary, changes to the visiting room policy were made in order to eliminate the introduction of contraband by visitors. They allowed for better observation and control of the inmates by the corrections officers, and to discourage excessive physical contact between the inmates and their visitors.

6. The new measures were first suggested in the spring of 1997, and were implemented from that time through February of 1998 in order to reduce problems the staff encountered under

the previous policy. They included: restricting use of vending machines to visitors only to limit inmates' handling of money; securing possible escape routes from the visiting room; removing couches to discourage physical intimacy; changes in seating position for inmates and visitors as well as for corrections officers; removing a wall that impaired visibility by staff; installation of security cameras; and restriction of inmates' movements within the room during visits. See Exs. A, K (¶ 9), C (¶ 6, D (¶¶ 9, 10, 13, 16), E (¶¶ 8-10), F (¶¶ 4-8).[1]

7. The evidence submitted in the *Martinez* report supports Defendants' position that the changes were introduced on an ongoing basis, and for the purpose stated by Defendants. Exs. A, K, E (¶ 4), F (¶¶ 3, 11), I (¶¶ 13, 15). The evidence also indicates that the changes made to the visiting room policy had no connection to Plaintiff, his wife, or to any incidents involving them. Exs. A, K, E (¶ 19), F (¶ 11).[2]

8. Defendant Garcia was first assigned to the visiting room at the North Facility in the summer of 1997, around the same time that the policies were being revised.[3] Garcia had initially allowed Sexson to bring in small packets of coffee during the visits with his wife, but eventually informed Plaintiff that he would have to discontinue the practice, as other inmates were requesting

---

[1] Exhibits, unless otherwise noted, are attached to the *Martinez* report.

[2] Other than those mentioned herein, there is no evidence of other incidents between Sexson and Garcia or Sexson and Romero except for one previous time when Defendant Romero had talked to Sexson about following the visiting rules due to concerns of the visiting room officer (not Defendant Garcia). According to Romero, Sexson had felt that he was being "singled out." Ex. J, ¶ 18.

[3] The orders Garcia followed regarding the new policies came from Major Leyba, who was in charge of security at the North Facility. See Ex. F.

3

similar favors and the practice was getting out of hand. According to the statements in his affidavit, Garcia felt that Sexson has held a grudge against him since that time. Ex. D, ¶¶ 25-31, 34-35.

9. Plaintiff's wife Cynthia made frequent visits to see her husband. During her visit on December 14, 1997, the undisputed facts are that Sexson and his wife did cause a problem in the visiting room. The incident involved a purse which an elderly lady had mistakenly been allowed to bring into the facility. The purse was confiscated and checked by Defendant Garcia and another officer in a segregated visitors' area, found not to contain any questionable items (it contained only credit cards and eyeglasses, Ex. D, ¶ 39), and secured until the end of the visit. Ex. D, ¶¶ 37-41; Ex. J, ¶¶ 10-11.

10. A few minutes after Garcia checked the purse, Sexson and his wife loudly asked Garcia whether he had found a gun in the purse.[4] Although Garcia assured Plaintiff that he had checked the purse and everything had checked out, Sexson and his wife continued laughing and joking about the purse and had begun asking another visitor and a nearby inmate whether they had seen a gun. Ex. D, ¶ 47.

11. At this point, Garcia became concerned that Sexson was being disruptive and upsetting visitors in the room, and called in Lt. Romero to speak with Sexson in the back of the room. Ex. B, ¶ 13; Ex. D, ¶¶ 48-50. When Plaintiff and his wife turned away and refused to acknowledge Romero, Captain Beals was called in. Ex. D, ¶ 50. Beals, with Lt. Romero, took Sexson aside and told him that his visit would be terminated if he continued to be disruptive. Ex. B, ¶¶ 7-11.

---

[4] According to Garcia, Sexson "called out loudly, 'Sgt. Garcia, did you see the purse? Are you letting in purses now? Are you following policies and rules?'" Ex. D, ¶ 42. Garcia emphasizes that Plaintiff was not able to observe him checking the purse from where he sat, and Plaintiff does not state that he did see a gun.

4

Despite this warning, on passing by Garcia on his way back into the visiting area, Plaintiff made yet another audible comment about a gun.[5] Capt. Beals then ordered Plaintiff's visit terminated, and informed Sexson's wife that she would have to go to the warden to reinstate visiting privileges. Ex. B, ¶ 11.

12. Plaintiff does not dispute that these events occurred. Although he protests that he did not "cause a seen [sic] in front of other inmates and their visitors," Resp. at 4, his version of the incident underscores Defendant's position. Moreover, evidence consisting of incident reports and internal memoranda submitted with the *Martinez* report supports the Defendants' position on the facts surrounding the confiscation of the purse as well as the facts concerning the conduct of Plaintiff and his wife which was clearly perceived as disruptive. See, e.g., Ex. 2; Ex. V.

13. On December 15, 1997, Sexson was placed in segregation for his own protection after Robert Rael, Captain at the North Facility, was confidentially informed by certain inmates that Sexson "was going to have problems in population." The investigation revealed Sexson was being discussed among inmates as having been a "jerk" in the visiting room and was perceived as the cause for the enforcement of stricter visiting regulations. Ex. I, ¶¶ 8-12. Rael's investigation also disclosed that the new visiting regulations were not connected to either Sexson or his wife. Rael stated in his affidavit that when he showed Plaintiff the memorandum regarding the confidential information, Sexson seemed "clearly surprised" that inmates were threatening him.

---

[5] Both Beal and Garcia remember Sexson's comment in passing as "Sure hope you find the gun." Ex. B, ¶ 10; Ex. D, ¶ 51. Lt. Romero remembers it as Sexson stating "I saw a gun." Ex. J, ¶ 16.

14. It was not until after Plaintiff was placed in protective segregation that he filed a grievance against Defendant Garcia, requesting that Garcia be fired. In the grievance, Sexson claimed that Garcia had been telling "false allegations . . . that it was me and my wife's fault for the tighter security in the visiting room" and that Garcia had been doing so for some time prior to the December incident. Ex. Y at 1. Plaintiff never filed a grievance against Defendant Romero.

15. Defendants' position that Sexson was unaware of any danger to himself is borne out by his failure to report to anyone that he felt his life or safety was jeopardized during the time he later alleged that Garcia was making false accusations about him and his wife. He never spoke to Capt. Beals who was in charge of day security, made daily checks throughout the units, and had the authority to change an officer's posting or initiate discipline. See Ex. B, ¶¶ 18-19. Neither did he report any safety concerns to either Major Leyba, who was in charge of security for the North Facility, or to Warden LeMaster. See, Ex. E, ¶¶ 20-21; Ex. F, ¶ 16.

16. Plaintiff, however, had not previously hesitated to register complaints with LeMaster in the past about being denied conjugal visits, to complain about the suspension of Cynthia Sexson's visiting privileges, which were eventually reinstated, or about the new visiting policies in general. Ex. E, ¶¶ 18, 21; Ex. D, ¶ 60.[6] Investigation into Sexson's complaints to a former correctional officer (Officer Moffet) involved Garcia's imposition of the stricter regulations, and about not being allowed to bring in coffee anymore to the visiting room. Ex. I, ¶ 31; Ex. D, ¶¶ 58-

---

[6] Because Sexson's conviction in Oklahoma was for murdering his first wife and for assisting in the suicide of his second wife in New Mexico, the warden did not allow Plaintiff this kind of visitation on the prison grounds.

59; Ex. Y (internal mem. by Moffet; internal mem. by Rael regarding interview of Garcia & Moffet).

17. Captain Rael, who was in charge of administrative grievances and discipline, concluded after investigating Sexson's allegations, that the grievance was filed "in retaliation for Sexson being placed in [protective segregation]." Ex. I, ¶ 33; Ex. Y at 4. Interviews of witnesses and other inmates revealed that other inmates were placing blame on Sexson for the tighter security measures, but that there had been no mention of Garcia's name in spreading these rumors.

18. Garcia denies spreading these rumors. Plaintiff submits two affidavits by inmates William Benson and Earl Mayfield stating that Garcia told them that it was the fault of Sexson and his wife that security was being tightened in the visiting room. Pltff's Exs. I, J. Notwithstanding these statements, and even assuming they would withstand a credibility inquiry, Plaintiff's claim ultimately fails he alleges no physical injury and requests damages only for emotional distress.

19. A provision in the Prison Litigation Reform Act ("PLRA") provides in part that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). Nowhere in his complaint or in his response to the *Martinez* report does Sexson allege to have suffered any physical injury. He does not dispute the fact submitted by Defendants that he was never assaulted or attacked while he was at the North Facility. Ex. I, ¶ 21.[7] The sole basis for his request for damages is "great mental anguish and mental distress." Compl. at 2, 6; see Flannery v. Wagner, 1998 WL 709762 (D.Kan.) (plaintiff's

---

[7] The medical evidence also supports the absence of any physical injury. Ex. BB.

claims for damages barred by the PLRA where plaintiff sought damages for emotional distress but never actually suffered any physical injury). Neither does Plaintiff request injunctive or declaratory relief, which might arguably not limited by the PLRA.[8]

20. In sum, Sexson's complaint for damages based solely on emotional distress which he allegedly suffered while in custody should be dismissed, based on the requirement in 42 U.S.C. § 1997e(e) for a prior showing of physical injury or manifestation.

## Recommendation

I recommend that the Plaintiff's civil rights complaint based on violations of the Eighth Amendment be dismissed with prejudice, thereby disposing of the entire above-captioned cause.

Within ten days after a party is served with a copy of these proposed findings and recommendations that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

UNITED STATES MAGISTRATE JUDGE

---

[8] The Tenth Circuit has addressed but did not decide whether 42 U.S.C. § 1997e(e) limits claims for declaratory or injunctive relief, but the court cited to two other circuits which interpret the provision as allowing such relief. Perkins v. Kansas Dept of Corrections, et al, 165 F.3d 803, 808 (10th Cir. 1999). In any event, a request for injunctive relief in this case would be moot, since Plaintiff has since been extradited to Oklahoma on detainer.